## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

AIR METHODS CORPORATION and
ROCKY MOUNTAIN HOLDINGS LLC,

     Plaintiffs,

vs.                                            Case No. 4:20-cv-462-AW-MAF

DAVID ALTMAIER, in his official
capacity as Commissioner of the Office
of Insurance Regulation,

     Defendant.

_____/

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Air Methods Corporation ("Air Methods") and its wholly-owned subsidiary Rocky Mountain Holdings, LLC ("Rocky Mountain") (collectively, "Air Methods"), by and through their undersigned attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

1.    This is an action to declare invalid and to permanently enjoin the enforcement of Florida House Bill 747, enacted on September 18, 2020, codified at new Florida Statutes sections 627.42397 and 641.514 ("HB 747"). The new law is unconstitutional and expressly preempted by federal law, namely the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b). Additionally, recently-enacted federal statutes preempt HB 747 on conflict and field preemption grounds.

2.    Congress included an express preemption clause in the ADA that prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b).

3.    Air Methods is an "air carrier" for purposes of the ADA because it is certified to provide interstate air transportation.  *See* 49 U.S.C. § 40102(a)(2); *see also Stout v. Med-Trans Corp.,* 313 F. Supp. 3d 1289, 1294-95 (N.D. Fla. 2018).

4.    The ADA prohibits state laws that regulate an air carrier's pricing, even when the state law purports to apply only to transports within the state.  *See Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1060-61 (10th Cir. 2019).

5.    Despite the ADA's well-established prohibition, HB 747 empowers insurers to expressly regulate the prices set by air ambulance service operators in the State of Florida ("State").

6.    Specifically, the law grants insurers the absolute right to determine the amount that will be paid to the air ambulance operator as reasonable payment for out-of-network air ambulance services.  It disregards completely the amount that was billed by the air ambulance operator for its services and the usual and customary amount that insurers have previously paid for out-of-network air ambulance services.

7.     The insurer's payment, in fact, is the only payment that the air ambulance operator, like Air Methods, receives because the law also prohibits any "balance billing" to patients for any amount in excess of the reimbursement rate set by the insurer other than payment of his or her applicable copayment, coinsurance, or deductible.

8.     The Office of Insurance Regulation ("OIR"), which has broad authority to enforce all provisions in the Insurance Code, is the entity charged with ensuring that all insurance and HMO policies allow for insurers to have this rate-setting power.

9.      Because HB 747 blatantly regulates pricing for air ambulance services, there is no question that HB 747 is expressly preempted by the ADA, and therefore violates the United States Constitution's Supremacy clause.  This is so even if the new law is described and rationalized as an effort to regulate the business of insurance.

10.     Additionally, HB 747 is subject to conflict and field preemption under two federal laws that address pricing and balance billing issues in the air ambulance industry on a nationwide basis.

11.     First, *The FAA Reauthorization Act of 2018* established an Air Ambulance and Patient Billing ("AAPB") Advisory Committee that has issued several reports to the U.S. Department of Transportation ("DOT") for purposes of

issuing national guidance and rules in order to prevent the application of inconsistent state laws like HB 747.

12.     Second, on December 27, 2020, Congress passed the *No Surprises Act* (the "Act"), as part of the Consolidated Appropriations Act (HR 133).  Under the Act, Congress has mandated a procedure for payment disputes between air ambulance providers and insurance carriers for out-of-network patients, which requires binding arbitration between an insurer and operator and also prohibits balance billing of the insured.  The law takes effect in January of 2022.

13.     In sum, HB 747 is expressly preempted by the ADA, and also conflict and field preempted by federal laws addressing these issues, and thus violates the Supremacy Clause, and must be declared unconstitutional and invalid.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under (i) the Supremacy Clause of the Constitution of the United States, Article VI, clause 2 ("the Supremacy Clause"); and (ii) the laws of the United States, specifically the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1).  Additionally, subject matter jurisdiction arises under 28 U.S.C. § 1337, because the matter in controversy arises under an Act of Congress regulating commerce, *i.e.*, the ADA, and the Federal Declaratory Judgment Act, 28

U.S.C. §§ 2201-2202, because this is an actual controversy in which Plaintiffs seek declaratory relief.

15.    Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because Defendant performs his official duties and transacts his affairs in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

16.    Air Methods, operating through its subsidiary Rocky Mountain, provides life-saving, emergency transport to critically injured patients in many states throughout the country, including the State of Florida.

17.    Air Methods is certified by the Federal Aviation Administration ("FAA") as an on-demand air carrier that is subject to pervasive federal regulation.

18.    Air Methods employs medical professionals and flight crews, owns and operates air medical service helicopters, and maintains all required state and local licensure and insurance that enables it to provide life-saving transportation services to those in need.

19.    Defendant David Altmaier, the Commissioner of the Florida OIR, is sued in his official capacity.  The Commissioner's office is charged with enforcing the law at issue and ensuring that all policies abide by the law's requirements.  *See*

Fla. Stat. § 20.121(3)(a)1. His office is located at 200 East Gaines Street, Tallahassee, Florida 32399.

20.     OIR has a statutory duty to enforce the provisions of the Florida Insurance Code and investigate violations of the Code, including the provisions enacted under HB 747. *See* Fla. Stat. § 624.307. As stated on its welcome page, OIR is responsible "for regulation, compliance, and enforcement of statutes related to the business of insurance." *See* https://www.floir.com/

21.     OIR's Life and Health Product Review unit "reviews all life and health policy forms and rates for compliance with Florida Statutes, regulations and actuarial standards." *See* https://www.floir.com/Office/AgencyOrganizationOperation.aspx Accordingly, OIR ensures that insurance policies comply with HB 747's terms.

22.     The OIR also has a "Life and Health Market Regulation" unit that conducts examinations and investigations of life and health insurers and related parties regarding business practices and alleged violations of the Florida Insurance Code. *Id.* This unit is authorized to "work with the Legal Services office to take administrative action, impose administrative penalties and require corrective action in order to protect insurance consumers from unlawful or harmful business practices." *Id.*

## FACTUAL BACKGROUND

**A.      Air Methods' Life-Saving Operations in Florida**

23.     Air Methods is a federally regulated air carrier that provides life-saving emergency air transportation services to critically ill and injured patients.

24.     Air Methods provides these emergency air ambulance services throughout the State of Florida to destinations in Florida and across state lines into neighboring states.

25.     Air Methods has 14 different bases located across Florida: from Escambia County in the Panhandle to Jacksonville in Northeast Florida to St. Lucie in Southeast Florida to Lee County in Southwest Florida.

26.     Air Methods operates on average one or two emergency air transports on a daily basis from each one of these 14 locations.

27.     Air Methods also serves several under-served rural communities, and transports patients from these rural communities to higher care facilities located in metro areas of Florida.

28.     Air Methods is authorized by the FAA to operate as a Part 135 air carrier providing on-demand air ambulance services.

29.     Air Methods also is registered with the DOT to operate as a Part 298 air taxi operator providing on-demand services.

30.    Pursuant to its Part 135 certificate and Part 298 registration, Air Methods is authorized to operate interstate flights and, as a common carrier for compensation, qualifies as an "air carrier" as that term is defined in the ADA.

31.    Air Methods maintains a fleet of air ambulances, fixed wing aircraft and helicopters, that are prepared to respond at a moment's notice to medical emergencies.  It provides life-saving emergency air ambulance transportation to critically ill or injured patients, while medical professionals provide in-flight care.

32.    Air Methods is dispatched by first responders at the scene of an accident or by a physician or medical facility that determines a patient requires emergency transport to a hospital that can offer a higher level of care.

33.    In accordance with federal and state law, Air Methods serves patients in its aircraft regardless of their insurance status or their ability to pay for the services.

34.    For uninsured patients, Air Methods often does not recover any portion of its fees.  For patients covered by Medicaid, Air Methods is reimbursed at the federal Medicaid rates. 14 C.F.R. § 447.15.  For Medicare patients, air ambulance providers cannot bill patients for services beyond deductibles and coinsurance requirements. 14 C.F.R. § 414.610.

35.    To continue to provide air ambulance service to every patient regardless of their ability to pay, Air Methods must receive its billed charges for a sufficient

proportion of its flights to offset the losses it suffers when it transports patients who are uninsured, underinsured or are covered by Medicare or Medicaid.

36.     For several insurers, Air Methods has negotiated rates for its air ambulance services and is considered an "in-network" provider for transports under these circumstances.   This arrangement allows for payment according to terms negotiated in advance and as agreed to by the insurer and Air Methods.

37.     When Air Methods does not have a contract with an insurer, however, they are performing those services "out-of-network."   Under these circumstances, Air Methods will bill insurers for its services at its full rates.

38.     For "out-of-network" transports, the insurance company reimburses providers at a rate based on usual and customary charges and then, as per the insurance contract with its insured, the insurer leaves the remainder to be paid by the insured.   Under these circumstances, a provider like Air Methods may then send a bill to the insured for the remaining balance.   This is known as "balance billing."

39.     Air Methods makes every attempt to work with the insurer (and the insured) to negotiate an appropriate reimbursement from the insurance company to reduce or eliminate any remaining balance for the patient.   In many cases, Air Methods must go through provider appeals or assist in facilitating member appeals for an insurer's initial determination of payment.   For certain insurers, such as CIGNA, Air Methods <u>must</u> balance bill the patient before the insurance company

will review an appeal by Air Methods on behalf of the insured of the initial payment for its services.  CIGNA does not allow providers an appeal path for disputes over the maximum reimbursable amount, thus requiring Air Methods to involve the insured in all payment disputes.  *See* https://www.cigna.com/health-care-providers/coverage-and-claims/appeals-disputes/   Air Methods works with the insured patient and the insurance company who has insured the patient to negotiate further payment from the insurance company.

**B.      Florida House Bill 747**

40.      On November 22, 2019, HB 747 was introduced as a bill in the Florida House of Representatives.  The purpose of HB 747 is to regulate the prices air ambulance service providers can receive in the State of Florida from its patients and their health insurers.

41.      On March 12, 2020, the Florida Legislature passed HB 747.

42.      On September 18, 2020, the Governor of Florida signed HB 747 and the law took effect immediately.

43.      Under HB 747, Florida Statutes are amended to limit the prices that air ambulance operators can receive for their transportation services from their patients' health insurers.  By definition, the reimbursement required under the statute must be something less than the air ambulance service provider's billed charges.

44.   HB 747 accomplishes this impact by allowing health insurers to pay "reasonable reimbursement" to an air ambulance service for out-of-network services.

45.   Air ambulance operators are forced to accept this vague and lower reimbursement rate, which is expressly not based upon air ambulance operators' billed charges and is not tied to the usual and customary reimbursement rate. Essentially, the new law gives the insurer *carte blanche* in setting the reimbursement rate.

46.   Air ambulance service providers like Air Methods are harmed by the express terms of this reimbursement provision because the rate being paid is (1) now set by the insurer without regard to the billed charges or usual and customary reimbursement rate, (2) will always be lower than Air Methods' billed charges, and (3) upon information and belief, has resulted in a significant drop in the average payment for out-of-network services.  By the State of Florida giving insurers this sanctioned legal discretion to decide payment for out-of-network services without regard for billed charges, the insurer has wholesale authority to decide the rate for the air ambulance services -- a rate that has shown to be demonstrably lower than not only the billed charges, but past reimbursements for out-of-network services.

47.   The OIR is charged with enforcing implementation of the new law. Specifically, OIR is responsible for approving and enforcing the implementation of

11

the statute's "reasonable reimbursement" language into the policy.  By ensuring that these rate-setting terms are incorporated in every insurance policy, OIR is causing harm to Air Methods through implementation of those terms, and therefore Air Methods (i) will never receive a reimbursement that is equal to its billed charges and (ii) since the law took effect, has consistently received reimbursements below the average payments received prior to the law's enactment.

48.    As explained above, the new law gives health insurers the ability to set air ambulance rates as the statute authorizes the insurers to pay whatever they determine to be a "reasonable reimbursement" rate.

49.    Since enforcement of HB 747, Air Methods has sustained significant economic losses.  Because reimbursements from insurers are not equal to Air Methods' billed charges and, in fact, have been less than "out-of-network" payments preceding enactment of the law, Air Methods has been harmed and sustained significant losses.

50.    For example, comparing the 9-month period before HB 747 took effect (January 2020 through September 2020) to the 6-month period after HB 747 took effect (October 2020 through March 2021), the average first primary payment for CIGNA dropped from $34,360 to $8,342 (excluding $0 first payments, the average post HB 747 payment is $18,096.77), showing a significant reduction in payments. Upon information and belief, this reduction was caused by HB 747

affording the insurer discretion to pay what the insurer alone considered a "reasonable reimbursement."

51.   Additionally, the new law prohibits any "balance billing" of the patient and states that any "payment by the insured of his or her applicable copayment, coinsurance, or deductible constitutes an accord and satisfaction of, and constitutes a release of, any claim for additional moneys owed by the insured to the health insurer or to any person or entity in connection with the air ambulance service." Fla. Stat. § 627.42397(1)(c)(2). Accordingly, the "reasonable reimbursement" provision results in lower payments to Air Methods, and the prohibition on "balance billing" acts as a final cap on such payments.

52.   For example, on October 23, 2020, a patient insured by CIGNA (referred to herein by the pseudonym "Jane Doe" to protect patient privacy) was transported by Air Methods. On October 29, 2020, Air Methods electronically billed $46,666.81 to CIGNA for its air ambulance services. On November 20, 2020, CIGNA made a payment of $11,723.54. The remaining balance of $34,943.27 for services provided by Air Methods to Jane Doe may not be recovered by Air Methods as a result of HB 747. This unrecoverable loss of a substantial portion of an account receivable is an injury in fact suffered by Air Methods and would be redressed by a judgment declaring that HB 747 is unconstitutional.

53.     Because insurers require their insureds to remain liable for the account balances before the insurers will negotiate further payment, Air Methods, in fact, cannot challenge and further negotiate the insurer's payment in many cases <u>unless and until</u> Air Methods has issued a balance bill to the patient.  Because the new act prohibits any balance billing to the patient, HB 747 has caused hardship and financial loss to Air Methods because there is no longer a negotiation process with insurers like CIGNA.  Air Methods is left to accept the lower payment -- which is determined solely by the insurers.

54.     The Florida House of Representatives, in fact, fully recognized and foresaw that HB 747 would have this "negative, indeterminate fiscal impact" on air ambulance service providers.[1]

55.     Not only does the "reasonable reimbursement" provision result in lower out-of-network reimbursements from the insurers, the linked prohibition on balance billing the patient under the new law serves to cap the insurer's payment of "reasonable reimbursement" at an amount well below the prices set by Air Methods.

56.     Indeed, the Florida Legislature expressly stated in HB 747 that the "reasonable reimbursement" and "balance billing" provisions in the new law <u>are not</u>

---

[1] *See* House of Representatives Staff Final Bill Analysis for HB 747 ("House Report") (2020), at 6, *available at* https://www.flsenate.gov/Session/Bill/2020/747/Analyses/h0747z.HMR.PDF.

enacted "individually" and "expressly finds them not to be severable."  This means that a finding of unconstitutionality of one provision (*i.e.,* the "reasonable reimbursement" provision) means the invalidity of the remainder of the law (*i.e.*, the "balance billing" provision).  When such clauses are included, as here with HB 747, courts "should adhere to the text of the nonseverability clause" and "hew closely to [it]." *See Barr v. Am. Ass'n of Political Consultants, Inc.,* 140 S. Ct. 2335, 2349 (2020).

57.    Even more concerning is that Air Methods will be forced to evaluate the ongoing financial viability of operations in the State as a result of the significant loss of revenue it has experienced under HB 747.  Indeed, the new law leaves little, or no, incentive for insurers to negotiate in good faith with Air Methods regarding in-network rates.

**C.    The Airline Deregulation Act**

58.    In 1978, Congress amended the Federal Aviation Act of 1958, 49 U.S.C. § 40101 *et. seq*., and enacted the ADA with the intention of deregulating the aviation industry.

59.    Congress included an express preemption clause in the ADA that prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1).

60.     This express preemption clause was included "to ensure that States would not undo federal deregulation with regulation of their own," *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378 (1992), and to "prevent conflicts and inconsistent regulations" of air carriers by the federal government and the 50 states. H.R. Rep. No. 95-1211, at 16 (1978).

61.     In passing the ADA, Congress determined that "an air transportation system relying on actual and potential competition" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality . . . of air transportation services."  49 U.S.C. § 40101(a)(12).

62.     Congress also recognized that it is in the public interest to place "maximum reliance on competitive market forces and on actual and potential competition − (A) to provide the needed air transportation system; and (B) to encourage efficient and well-managed carriers to earn adequate profits and attract capital."  49 U.S.C. § 40101(a)(6).

63.     The ADA's preemption clause is interpreted broadly, and preemption is found where claims, directly or indirectly, have "a connection with, or reference to" an air carrier's prices, routes or services.  *See Nw., Inc. v. Ginsberg*, 572 U.S.

273, 280-81 (2014); *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).[2]

64.     HB 747's ill-conceived pricing scheme is federally preempted by the ADA because it allows the State to regulate and set rates for air ambulance services in contravention of the ADA's express prohibition of such state conduct.

65.     State statutes like HB 747 that regulate air ambulance pricing have been stricken in declaratory judgment actions like this, where the defendant was the relevant state's insurance commissioner charged with enforcing the law.    In *Guardian Flight, LLC v. Godfread*, the U.S. Court of Appeals for the Eighth Circuit affirmed ADA preemption of a newly-enacted North Dakota statute that had insurers reimburse air ambulance operators an amount based on the average of the insurer's in-network rates.   991 F.3d 916, 9021 (8th Cir. 2021).   Because the North Dakota law made the operator accept a *state-mandated rate* and prohibited balance billing (the same as HB 747 does), the district court had found "it caps air ambulance prices" and is "precisely the type of state regulation Congress sought to prevent when it included an express preemption clause in the ADA." *Guardian Flight, LLC v. Godfread*, 359 F. Supp. 3d 744, 755 (D.N.D. 2019); *see also Valley Med Flight, Inc.*

---

[2] To the extent the Commissioner asserts reverse preemption under the McCarran-Ferguson Act, it is clear that HB 747 regulates the activities of an air ambulance operator by setting the price for the services, and is therefore not limited to the relationship between the insured and the insurer.

*v. Dwelle*, 171 F. Supp. 3d 930, 943-45 (D.N.D. 2016) (in suit against state officials charged with overseeing health insurance and workers' compensation policies, granting declaratory judgment and striking state law that created priority call lists for only those air ambulance operators that had in-network contracts with insurers).

66.    Significantly, the U.S. Court of Appeals for the Eleventh Circuit in *Bailey v. Rocky Mountain Holdings, LLC*, 889 F.3d 1259, 1271 (11th Cir. 2018) likewise found ADA preemption of a Florida statute with a balance billing provision as the law imposed a "price restriction" and, thus, had "'[a] forbidden significant effect' on the prices of an air carrier." 889 F.3d at 1271. *See also EagleMed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) (holding fee schedules in workers compensation act were preempted because they regulated air ambulances' prices); *Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 633 (S.D. W. Va. 2017) (holding ADA preempted West Virginia law prohibiting air ambulance companies from balance billing patients insured by West Virginia's Public Employees Insurance Agency), *aff'd,* 910 F.3d 751 (4th Cir. 2018).

67.    The House Report for HB 747 and the Senate Report regarding the sister Senate Bill (SB 736) expressly recognize the foregoing cases, including the Eleventh Circuit *Bailey* decision, and the various states' repeated failed efforts to enact new laws or enforce state fee schedules in an attempt to cap or restrict air

ambulance prices.[3]   Additionally, the Senate Report predicted that the new law would be struck down given the breadth of the ADA's prohibition of state regulation of air carrier prices.[4]

68.   The DOT's Office of the General Counsel also has reinforced an expansive view of preemption and reliance on market forces, specifically in the air ambulance context.   In its *Guidelines for the Use and Availability of Helicopter Emergency Medical Transport (HEMS)*,[5] the Office of the General Counsel summarizes its various opinions on FAA and ADA preemption in air ambulance cases.   In discussing federal preemption of state laws that require certificates of authority to operate in the state, the Office notably confirmed that:

> [o]nce the Secretary [of Transportation] certifies an air ambulance operator, *the competitive marketplace, rather than state regulations*, controls the operator's prices, routes, and services, and only the Secretary may revoke an air ambulance operator's certificate.

*Id*. at 11 (emphasis added).

---

[3] *See* House Report, at 3-4; Senate Bill Analysis and Fiscal Impact Statement for SB 736 (the sister bill to HB 747) ("Senate Report"), at 7-8 (2020), *available at* https://www.flsenate.gov/Session/Bill/2020/736/Analyses/2020s00736.rc.PDF

[4] *See* Senate Report, at 11 (recognizing ADA preemption as one of the "Technical Deficiencies" with the new law).

[5] *Available at* https://www.transportation.gov/sites/dot.gov/files/docs/Guidelines%20for%20the%20Use%20and%20Availability%20of%20Helicopter%20Emergency%20Medical%20Transport%20%28HEMS%29%20OCR.pdf.

**D.      The FAA Reauthorization Act of 2018**

69.      The FAA Reauthorization Act established an Air Ambulance and Patient Billing ("AAPB") Advisory Committee, comprised of health insurers and air ambulance operators, to review ways to improve the disclosure of air ambulance charges, better inform consumers of insurance options, and protect them from balance billing.  Pub. L. No. 115-254, § 418, 132 Stat. 3186, 3334-3336 (2018).

70.      The AAPB has issued several reports, which the DOT is presently using to conduct oversight of air ambulance service providers and to issue forthcoming guidance concerning provider pricing and billing practices.   This will include guidance for States to refer such matters to the Secretary of Transportation.  Pub. L. No. 115-254, § 420, 132 Stat. 3336.

71.      DOT has plenary authority to investigate allegedly unfair business practices of air ambulance operators, including complaints concerning prices and balance billing, and bring enforcement actions.  *See* 49 U.S.C. § 41712(a).  DOT reviews consumer complaints to determine compliance with federal law and identify areas of concern that serve as the basis for *federal* rulemaking and legislation.

**E.      Federal No Surprises Act**

72.      On December 27, 2020, Congress passed the *No Surprises Act* (the "Act"), as part of the Consolidated Appropriations Act (HR 133).

73.     The new legislation, effective in January 2022, is intended to protect consumers from surprise bills for: (1) emergency services delivered by out-of-network providers, including emergency air ambulance operators, or by out-of-network facilities; and (2) nonemergency services provided by out-of-network providers in network facilities and for which patients do not consent. Consumers' costs will be limited to cost-sharing amounts that apply to in-network services. Service providers are banned from billing patients for any higher amounts.

74.     Section 105 of the Act, titled "*Ending surprise air ambulance bills*," specifically covers and preempts the reimbursement and billing rules enacted by the Florida Legislature in HB 747.  Section 105 holds patients harmless from surprise air ambulance medical bills and only requires them to pay the in-network cost-sharing amount for out-of-network air ambulances. That cost-sharing amount is applied to their in-network deductible. Air ambulances are barred from sending patients surprise bills for more than the in-network cost-sharing amount.

75.     The new federal law also provides for a 30-day open negotiation period for air ambulance providers and payers to settle out-of-network claims. If the parties are unable to reach a negotiated agreement, they may access binding arbitration through an Independent Dispute Resolution ("IDR") process. By January 21, 2022, the Secretary of Labor and Secretary of Transportation are to jointly establish by regulation the specific IDR process under which, in the case of air ambulance

21

services, a certified IDR entity will determine the amount of payment under the plan or coverage for such services.

76.     The Act further confirms federal preemption of HB 747 on conflict and field preemption grounds.  Congress specifically enacted a federal statute to address the very issues that are at the heart of HB 747.

77.     Unlike HB 747, the Act does not address nor dictate the amount that an insurer pays an air ambulance provider for out-of-network services. Rather, the parties will have a 30-day open negotiation period for air ambulance providers and payers to settle out-of-network claims.  If no agreement is reached, the Act provides for binding arbitration.

**Count I: Declaratory Judgment that HB 747 Is Preempted By the ADA and Injunctive Relief to Enjoin Its Enforcement**

78.     Plaintiffs repeat and reallege paragraphs 1 through 77 of this Amended Complaint as though fully set forth herein.

79.     HB 747 is preempted by the ADA because it "relates to" the prices and services provided by air ambulance service providers in Florida, including Air Methods.

80.     Specifically, HB 747 directly affects the prices that air ambulance operators may charge because the operator will be required to accept the prices mandated by the statute, which by definition will be less than the billed charges of the operator.

81.     Air Methods, if unable to set its air carrier rates to sustain its operations in the State, will likely be forced to cease its critical life-saving operations in many counties, including the rural communities in Florida, with such cessation at the expense of the life and health of Florida's citizens.

82.     Because HB 747 (i) authorizes health insurers to ignore billed charges and set reimbursement rates, (ii) prohibits balance billing, and (iii) threatens Air Methods' ability to continue to provide services to the Florida emergency air transport market, the statute is preempted by the ADA and this Court should declare HB 747 invalid and unenforceable.

**Count II: Declaratory Judgment that HB 747 Violates the Supremacy Clause of the U.S. Constitution and Injunctive Relief to Enjoin Its Enforcement**

83.     Plaintiffs repeat and reallege paragraphs 1 through 82 of this Amended Complaint as though fully set forth herein.

84.     Pursuant to Article VI, Section 2 of the U.S. Constitution (the Supremacy Clause), any state statute, rule or regulation that conflicts with federal law is preempted.

85.     Specifically, HB 747 is unconstitutional and conflicts with the ADA, which prohibits states from enacting or enforcing laws that relate to prices, routes or services of air carriers such as Air Methods.

86.     Additionally, HB 747 conflicts with (i) the *FAA Reauthorization Act*, which specifically designates the DOT to oversee and issue guidance and rules on

pricing and balance billing practices in the air ambulance industry, and (ii) the *No Surprises Act,* which provides for negotiation of reimbursement rates for out-of-network transports, and if necessary arbitration, rather than forcing air ambulance operators to accept whatever the insurer considers a "reasonable reimbursement."

87.    Accordingly, this Court should declare that the provisions of HB 747 are invalid and unenforceable because they violate the Supremacy Clause of the U.S. Constitution, Article VI.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

(1)    Issue a declaratory judgment that declares HB 747 invalid and unenforceable as preempted by the Constitution and laws of the United States;

(2)    Issue a preliminary injunction, the same to be made permanent on final judgment:
(a)  Restraining and enjoining defendant, his employees, or agents from enforcing or seeking to enforce the provisions of HB 747 determined by this Court to be invalid and preempted by federal law; and

(b)  Requiring defendant to issue such notices, and take such steps as shall be necessary and appropriate to carry into effect the substance and intent of paragraph (a) above, including but not limited to the requirement that defendant publicly withdraw, and rescind any orders that seek to enforce, the provisions of HB 747 herein determined by this Court to be preempted by federal law; and

(3)    Grant such other further or different relief as to which the Plaintiffs may be entitled.

Dated:  April 28, 2021              HOLLAND & KNIGHT LLP
Attorneys for Plaintiffs

*/s/ Tiffany A. Roddenberry*
Tiffany A. Roddenberry
Florida Bar No.  92524
Email:  tiffany.roddenberry@hklaw.com
315 South Calhoun Street, Suite 600
Tallahassee, FL 32301
Tel: (850) 425-5658

*/s/ Judith R. Nemsick*
Judith R. Nemsick
(admitted *pro hac vice*)
Email:  judy.nemsick@hklaw.com
31 West 52nd Street
New York, NY 10019
Tel: (212) 513-3200

*/s/ Philip E. Rothschild*
Philip E. Rothschild
Florida Bar No. 88536
Email: phil.rothschild@hklaw.com
515 East Las Olas Boulevard, 12th Floor
Fort Lauderdale, FL 33302-4070
Tel:   (954) 525-1000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to  all counsel of record through the Court's CM/ECF system on April 28,  2021.

*s/ Tiffany A. Roddenberry*
Tiffany A. Roddenberry
Florida Bar No. 92524